On this case on logic, 2-16-4107, v. Village of Lake Zurich, defendant is Ethelene, arguing on behalf of Ms. Zinovich. Defendant is Jolanta A. Zinovich, arguing on behalf of defendant Ethelene. Good morning, counsel. Good morning. Ms. Zinovich. Thank you. Good morning. Jolanta Zinovich on behalf of the plaintiff's appellant, Stephen Garris. This case comes to you on a review of the circuit court decision to grant summary judgment on an appeal of my client's for placebo benefits. My client is a firefighter paramedic for the Village of Lake Zurich. He has been a firefighter paramedic since 1992. In 2012... He was a very well-trained firefighter, correct? He was very well-trained, yes. A member of the TRT team and familiar with high altitudes and safety devices, correct? Yes, and he's used a number of different devices, although the device that he used in this particular instance was a new device that he had never used before. Although similar to other devices he's used, it was new. Under GAFNI and under the Act, would you agree that the emergency must be the result of unforeseen circumstances? We do, and in this case... What was unforeseen here? In this case, the unforeseen circumstance was the slipping of the device. As a very well-trained firefighter, knowing the circumstances under which he was doing this training and understanding how it was supposed to go... In his experience, his professional opinion, something went wrong. Didn't he have the safety device? He did have a safety device, but just as the GAFNI court said that any fire... In that particular case, we obviously had a live fire. Any fire, no matter what safety devices, no matter how much safety precautions you take, every single live fire has a danger component to it. This was not a live fire. It was not. It was a controlled environment, was it not? This was basically a wall. No, it was a training tower, and he was on the third floor of the tower, climbing out the window. There is really no way to control gravity. There's no way to control the fact that if something goes wrong, if that safety device fails, and in this case, the actual device failed... What evidence is there that the safety filed... Failed. I'm sorry. Failed. The fact that you have an experienced firefighter who said that something went wrong... Well, the safety failed. I'm sorry. Not the device. It was testimony that the device failed, I believe, but is there anything that you can point to where, at that time, he knew the safety also failed? It's the fact that it didn't catch him, the fact that he was free-falling, and as a firefighter with as much training as he had, that situation was unusual. It should have caught him much faster than when it did. So he had no idea, even though it was maybe a split second, he had no idea why it didn't click, why either the safety device or the actual device was using... His testimony was he didn't think of that. I'm sorry? His testimony at the hearing, at the benefits hearing, he didn't think of that. He didn't have time to think, he said, about activating the safety device. Well, the safety device should automatically activate. There's nothing that he can do in order to activate that safety device. And he testified that he stopped, that he was stopped. Eventually he did stop, yes. Eventually he did, otherwise he wouldn't be here because he wouldn't survive that fall. But once again, it was the fact that it's a free-fall for as many seconds as it took, and in his professional opinion, and under the experience that he has with other devices, similar to this, using safety devices in the past, he knew something was wrong. That device did not catch him when it was supposed to, and he had no choice but to react. And his initial reaction, based on his training, his education, was to try to stop himself and try to... What stopped him? Eventually, we believe it was a safety device. I don't think there's really... There's nothing that tells us what it was. Unfortunately, by the time that other people came, that safety device was taken down. So we don't know if it was set up properly. We just don't know. And the person... Excuse me. I need to hear the whole answers per our earlier discussion. Thanks. Go ahead. And unfortunately, the gentleman who set it up, the other firefighter, passed away shortly thereafter. So we don't have any testimony from him. Again, it's a matter of the experience this firefighter has, knowing and using safety devices in the past. And in this particular instance, it simply didn't catch him when it was supposed to. Eventually, it did. Thank goodness it did. But in his professional opinion and based on his experience, it should have caught him earlier. And he had no choice but to react. And that was the unforeseen circumstance to him. And even though it was just a couple seconds, it still constituted an emergency. Did I answer your question, sir? No. Okay. The slippage was a fraction of a second. That was his testimony, correct? It was a fraction of a second. And his testimony... You're shaking your head, yes. Yes. I believe it was a fraction or a second or so. He said it was slippage while he was getting his feet pointed towards the ground. And that was the unforeseen circumstance. That's... Right. The device was not designed to slip the way that it did. It wasn't supposed to do that. It was supposed to slowly let him come down the wall. In this instance, what it did is slip, and he was moving at a rate that was much faster than what it should have been. And that's why he said it slipped or something malfunctioned, because that was not the design of this particular device. Isn't the question not what your client believed, but the question is whether or not his subjective belief that it was an emergency is objectively reasonable from the standpoint of what a reasonable firefighter would believe under those same circumstances? I do believe that this court has to look at the subjective view of my client and then look at the objective view of other firefighters. Whether or not it was objectively reasonable for him to, instead of relying upon a safety device, show himself around. I do agree with that. And I believe, once again, based on his training, based on his education, as your Honor mentioned, he is highly trained. This is not a firefighter who just came out of the academy. He's not a firefighter who's been on the job for only a couple years. Based on that, he's in the best position to tell you whether or not this was appropriate. To answer my question, it's based upon what an objectively reasonable firefighter would believe under the circumstances, correct? It's, I believe, pursuant to the case law and pursuant to how the statute should be read, it should be the subjective view of my client. And once you determine his subjective view, you look at the objective view of other firefighters to determine if it's reasonable. But his subjective view, based on his experience, education, and knowledge, is the first prong, if you will, that this court should be looking at. And he testified that he trusted Gonzalez 100%. He did. They were very good friends. And you must remember that this was shortly after he passed away. I'm sorry. Okay. Let me ask a series of questions. You don't have to answer the question. Okay. He testified that he trusted Gonzalez 100%. Yes. He testified that Gonzalez affixed the safety device to him, correct? Yes. And the safety device was there in case of any malfunction because they're trained. The purpose of this is to become familiar with the equipment for real, and to quote your client, for real emergencies when there's a real fire. And here there was no real fire. There was no smoke. There were no gases, correct? That's correct. And which the court in Gaffney mentions that in Gaffney there was a fire. There were men trapped on the stairwell. And here the only potential danger was to your client in a free fall, but he had the safety device, correct? Yes, he did. But just as Gaffney said that there's no safety measures that can make a fire less dangerous than it is, similar to a free fall from a third-story window. Would you agree with Justice Seno's question earlier that this was a planned, controlled exercise under planned and controlled conditions? I don't believe that you can plan and control every aspect of going out the window in the free fall. No, I don't. I don't agree with that. How is this any different than somebody who's doing a training exercise with a vehicle and, you know, a crash is about to happen and they don't trust the safety belt, so they just release the safety belt. Is that an emergency? They don't trust the safety strap. If they intentionally release the safety strap, then it's obviously their own doing. But if that safety strap fails them, that's not their own doing, if you will. In this case, the safety device failed my client, and although it eventually caught him as it should have in that moment, it failed him. So your argument is that there's a material issue of fact. Yes. What's the material issue of fact? Whether or not there was a true emergency here, because my client believes there was. His subjective view, he believes it was. And I think we need an opportunity to bring in for the trial court the objective view, whether or not that was reasonable. At this point, we have not had a chance to do that. And just as the GAFNI, and I know I keep going back to the GAFNI court, but there is no set of controlled circumstances here that will absolutely eliminate the dangers that were associated with this training exercise. Wouldn't that be true of almost any firefighter exercise? If it's... They are risk-takers by trade, by their profession. They're trained to learn and to control the environment that they're in, and that's the purpose of the training, so that when there is a, quote, unquote, real emergency, they know how to respond. And a typical training exercise would not be an emergency, and I absolutely agree with that. But just as GAFNI turned into an emergency, that's what happened here. This is a different situation than... And I'm going to butcher any lemonades. It's different because in that case, it was controlled. All they had was the blackout masks, and they could have stopped the exercise at any moment. In this particular instance, as my client is dangling from the window, there is no stopping of that training exercise. If he's falling, there's nothing to stop. He has a safety belt, and so the safety belt, isn't that the only reasonable inference from the use of the safety belt, or safety line, I should say, is that the potential for that was foreseen, not unforeseen? Well, if the safety belt was 100% accurate, then I would agree. Could you please finish your answer? Thank you. I'm sorry. The safety devices do fail. They are not 100% guaranteed, so there is no guarantee for my client. And that's similar to the DeRose case, where the officer who was answering a call, that 99% of the time is not a legitimate call, and only 1% of the time is a legitimate call, knowing, going into it, knowing that there's only 1% chance that he might actually face an emergency or danger, the court still found it might be a small chance, but it's still there, and that's still an emergency. I believe the Village Artist, in their brief, that DeRose has been abrogated by Gaffney, would you agree? I think you have to read them side by side, I think, because they are different circumstances. But I still believe both Gaffney and DeRose support my client's position. That your client, we consider his subjective belief, he believed it was an emergency. And I think any, objectively, any firefighter, his position would have done the same, especially based on the training they've had, and that's what he testified to in his deposition. Based on the training, based on the exercises he's already had, based on all of the high angles, everything that he knows, this was an emergency. There's something wrong that happened here, and he had to react. He was stopped. Eventually, yes. At about the second story window, correct? Eventually he was stopped, yes. We believe it was the second. In a fraction of a second. And even a fraction of a second. And that's what his testimony was. He didn't have time to think, because it was a fraction of a second, so he didn't rely on the safety belt. He tried to maneuver himself out of a fall. Well, I don't know if I would classify it this way. Yes, he did say that he didn't have time to think, so his instinct, based on his education, kicked in. But the safety device should have caught him prior to those two or three seconds, whatever it was. It should have caught him, and it didn't, based on the experience he's had with the safety device. But he said he had no experience with that device. Not with the actual device he was testing, but I'm talking about the harness, the safety device. I guess we should say that there was a harness. Which one failed him, then? Well, in his opinion at that point, the actual device he was using is what slipped. And as he was slipping, the harness safety device should have caught him but did not. And that's when he went into reaction mode and said, I need to do something to help myself. Did the reaction, which ended up with injury, and after that is when the safety device caught him. What was the imminent danger, given the fact that he trusted Gonzalez 100%, was familiar with the safety line, there were no issues with the safety line that your client could point to? What was the imminent danger of death or great bodily harm to your client? Well, there was an issue that my client pointed to with the safety device, and that's the fact that it didn't work as it was meant to work, which was immediately catch him as he was free falling. For him at that moment. Excuse me. I'm sorry, I just need to hear the whole answer. Go ahead. You want to finish? I'm sorry, I lost my train of thought. Yes, I think we were with the safety device. It eventually did catch him, but in that moment where he was free falling, based on his experience, based on his education, he knew it should have caught him earlier. So at that moment, he had no idea whether it was going to malfunction or whether it was going to work. And unfortunately, although safety devices are supposed to be great, that's what they're there for, to be safe, they are not 100%. And we see that constantly with very educated, very well-trained individuals who are hurt in training exercises or even killed. And that's not to say that all safety devices are bad, but in this case, the safety device didn't catch him right away, which is what it was meant to do. Do you have anything else right now? Anything else now? Okay. You'll have time on rebuttal. Thank you. Thank you. Ms. Heintzelman? Good morning. Good morning. Would you mind adjusting the microphone? Can you hear me okay? Yes. I'm not usually accused of being soft-spoken, so I don't want to yell into the microphone. It's a big room, high ceiling, so everybody, there are people in the back who need to hear you also. Okay. Thank you. Thank you for this opportunity. My name is Yvette Heintzelman. I represent the village of Lake Zurich. Rather than go through the outline I had, I'd like to address some of the questions and comments that counsel made to you. I think that there is a fundamental misunderstanding of how this device works. The device is a carabiner, which we all use in some respects. It's a clip about this big, and one end of it opens. And when you squeeze it to open, that's what creates the slack in the rope and lowers the firefighter down the wall. The way this device works is that the firefighter, Garris, had the safety device on. It was an in-service training, not a regular training, but a training to teach him how to use the device. Therefore, it was under controlled circumstances. He was not under any hurry. There was no live fire. There was no sense of urgency. None of that. This was, here's a new piece of equipment. We need you all to learn how to use it. Take your time. Try it out as many times as you want. Watch the videotape. See how it works. And then practice using it. That's what we're talking about. This is not training like Gaffney. It's not training like Luminous. This is putting a piece of equipment into service, getting the firefighters accustomed to how it works. On that point, even though it was in-service training, the plaintiff testified that he and Gonzalez had reached an agreement to do the training as if it was a live fire. Does that create a material issue of fact? I don't recall that testimony that it was a live, that he taught it as a live fire. He said that he and Gonzalez agreed to do the training like it was a live fire. I believe he testified that he did the training as it was depicted in the videotape, which is part of the record. And if you watch the videotape, it is slow motion out the window, slow motion to right yourself, because you go out head first, you right yourself, and then you walk down the training tower. The village of Lake Zurich has a training tower in the back of their fire department. So all of this is slow motion. And, in fact, when they're responding to fires, it's slow motion anyway for purposes of safety. In this situation, they're learning to use the device as part of that process. And in order to eliminate any unforeseen circumstances, the firefighter, Garris, was also attached to a safety line. Contrary to counsel's representations, the testimony is the safety line never engaged. And the reason it did not engage is because he never descended fast enough for there to be an emergency and for him to be saved. Okay? His descent was, under his testimony, this whole thing occurred in a second. There was no, he didn't descend, he wasn't falling to the ground, he wasn't going head first. None of that happened. He was correcting himself. Pardon me? He said he was correcting himself. He was writing himself, which occurs, if you look at the videotape, it occurs at the third story as soon as you get out of the window. So he, this happened in a second. And what you do is, going back to how the device works, you squeeze the carabiner, it releases rope, and you descend. If you squeeze too hard, more rope is released than you think, probably, or expect. And if I had to guess, I would expect that's what happened to Firefighter Garretts. All you do is let go. And that's what he did here. He let go of the device. As soon as you let go of the device, it catches you, and you do not descend anymore. And what happened here, what the testimony is, is that the device caught him. He let go. The device stopped him. The safety was never engaged because he was never in imminent danger because he wasn't descending fast. And it prevented the safety, the existence of the safety line, which is separate and apart from the training device, was to prevent any unforeseen circumstances from occurring, to prevent any danger to the firefighter, and to allow for mistakes to happen because those mistakes, should they be made, will not result in a catastrophic injury to the firefighter, you know, falling to the ground headfirst. Now, his subjective view was that the device malfunctioned and did create an emergency situation because his perception was he could have fallen to the ground and hit his head headfirst. That was his testimony in his deposition that he would have you believe then that in the span of a second, a second, he had all of those thoughts going through his head. Well, as counsel indicated, this was an experienced firefighter, correct? I mean, it's not as if, you know, somebody who's never been in a real fire or been under the stressful situations that firefighters are looking at this, but he, as an experienced firefighter, was believing this even in a second. And my response to that is that's what makes this subjective belief more unreasonable. We had testimony from an equivalent, I think he's a battalion chief, Wenzel, who testified about this device, the training that's used, the safety line that was invoked, the fact that the existence of the safety line eliminated any possibility for an emergency, the fact that it didn't engage any also tests. He also, after this accident happened, they preserved the device. Nobody touched it. We had Captain Wenzel take the device out, go up to the training tower, and rappel down to make sure that there was nothing wrong with it. That was the device you're talking about. The actual device. Not the safety line. Not the safety line. Right. And then, go ahead. I'm sorry. The evidence from plaintiff was that he is aware of no defect in the device. He doesn't have any evidence that it malfunctioned. He has no issue with the setup of the safety device. He is confident and sure that Firefighter Gonzalez set up the safety device properly. As a trained member of the TRT team, he is trained to do all kinds of rappelling. They rappelled off the water tower and out of Lake Zurich. Many, many stories higher than this. But this is a new device that he was learning to use. Similar to ones that he has used as part of the TRT team. All right. Safer than what he was used to using, which is the figure eight rope, where he released it himself. Okay. Right now, we're looking at, though, the first part of this, his subjective belief. Correct? Well, actually, I don't believe that's the proper standard. I think the proper standard is the objective belief on whether or not it's reasonable to think that you are responding to an emergency. His conduct was... Go ahead. I'm sorry. His conduct was more like a reflex action. He kicked his foot out and hit the wall. That's not preventing. That's not responding to emergency. I slipped. I kicked my foot out. I hit the sill of the window. This is a material question of fact. I mean, this part of was it objectively reasonable for him to think? Would other firefighters have felt this was an emergency situation or that his belief, his one-second belief or reaction was reasonable? So don't we need to look at this under the rubric of, I mean, since we're in summary judgment, that this was a material issue of fact? No, because other firefighters would not objectively believe that this was an emergency. And how do we know that? We had testimony to that effect. We had testimony in the record to that effect. I mean, first, it's not subjective because, you know, at this point in time, it wouldn't be any firefighter could say it was an emergency. I believed it. You may not agree with me, but I believed it. That's what I thought. So at that point in time, why is there even the standard? If we're going to give out health insurance benefits based upon what you thought, you might as well just put forth the application. There's no standard necessary. You believe it, you get it. That's certainly not the case from my perspective. The Public Safety Employee Benefits Protection Act was designed to give firefighters health insurance benefits for themselves, their families, and their dependents when they are serving the public good. They are saving us. The training is an extension of that. But these guys, they put their lives and their lives for us. They do. And because they do that, when they are catastrophically injured and they can't work anymore, they deserve to get a benefit. But if they have an accident using a piece of equipment, that is not the same thing. And we've expanded this benefit to the point where it's almost become an entitlement as opposed to engaging in the behaviors that we are rewarding. Can we get back to the issues? In the testimony at the benefits hearing, Garris testified that the injury occurred while he was transferring himself when I got hurt. Now, do we know exactly where on the tower the injury occurred? There was also testimony regarding the second story windowsill. He doesn't know where the injury occurred. It just happened there during that one fraction of a second between the third and second floor when he was trying to right himself. If his testimony is accurate, they followed the process in the videotape, which is what everybody was to do. He went out the third story window at first. He righted himself. And then you walk down the building. Is there anything in the record challenging or contesting the defendant's trust in Gonzalez, that he trusted Gonzalez and he trusted the safety line? No. That is not disputed. So there's no question about the integrity of the safety line or the integrity of the F-4? No. And, in fact, these two decided that they wanted to go out and do this training exercise contrary to the process because he was not told to go out there and do it today. He came back and they said, You'll do it some other day. And Garris went in to the Battalion Chief Wenzel and to Batchelor and said, No, we want to do it, we want to do it, we want to go out and do it now. So this idea that he would have any concern about Gonzalez is belied by the fact that he wanted to go out there with Gonzalez himself and take care of it at that time and place when he didn't need to. There was an order to get it done, but not an order to get it done today, right now. Well, Garris, I'm sorry, Gonzalez had control over the safety line, but not, did he not? He was the one who controlled the safety line. That's correct. He set it up for. He set it up. And it's a harness. Okay, but there's nothing that he had control over in terms of how it functioned or didn't function, correct? During the course of the training exercise, there wasn't anything he did with, he, Gonzalez, did with respect to this harness. He set it up, but then he didn't touch it after that, right? I mean, he didn't need to touch it to make it function or work. Correct. In fact, it's a rope, and the plaintiff was harnessed in it, and I think he's clipped at the back of his neck, and should he descend in a fashion that created an emergency, it automatically engaged. It should have automatically engaged. It would have automatically engaged. There's no evidence in the record that there was anything wrong, and plaintiff concedes that there is no evidence. There is no material issue of fact about the safety harness, about the setup of the device. There's, frankly, no issue of material fact about whether or not the device was defective, because it wasn't. It's been used safely since, and plaintiff stated he had no evidence that there was a problem with the safety, with a problem with the device, with the way that it was set up, with watching the videotape, none of that. I'm sorry. That's okay. I do have a question, but I didn't mean to cut you off, which has been our custom thus far this morning. But at any rate, it seems to me, reading between the lines, that there was some indication that firefighter Garris went out that window and down the wall more quickly than he was supposed to. I listened to you say, out head first, immediately right yourself, then walk down. Now, I'm not a rappeller, but it would seem to me you right yourself, then you begin to release the rope. Is that fair? That's correct. And it appears that he didn't do that. He must have released the rope before he attempted to right himself. His testimony about how the accident occurred, in particular, is sometimes he said he was trying to right himself. Sometimes he said he hit the second-story window as opposed to the third-story window. So he kicked something or hit something, and that caused the damage to his ankle and leg. And if he descended too quickly, it's because he released the device quicker than he anticipated. Because you can go down there, you're supposed to go down slow. You could decide that you're going to go down more rapidly. But only after you have righted yourself, if you will. Well, yeah, you wouldn't want to release yourself head first. That would be an error on his part. If he did that, the safety would have caught him because he'd be going too fast, too far, too fast. Right. It just seemed that there was an indication somewhere in the record that he attempted to complete this exercise, I'll call it an exercise, too quickly. I don't think intentionally. Okay. I don't think that that was intentional. Okay, fair enough. I think he may have testified that he descended quicker than he anticipated, but I don't think it was that he was trying to get it done too quickly. Okay. If there are any other questions. Sure, go ahead. Regarding the safety line, this question was asked of Firefighter Garris, and he was asked questions regarding the safety line. He said, it's intended purposes to catch me, yes, ma'am. I know it would. I tell you what, if that split second at that point in time is reaction, there's no time to stop and think. Nothing I ever did involved a time to stop and think. I don't know when I'm going to stop. All I want to do is stop it. So he, in that fraction of a second, he thought he was in danger. He thought this is, you know, regardless of the safety line, he thought that he was falling and he better do something to stop the fall. Does that create materialistic effect? I don't believe that it does. Because that was not reasonable. It was not reasonable. That was his belief. It was not reasonable. I believe the case law is clear since Gaffney that it has to be objective belief that he is responding to an unforeseen circumstances involving eminent danger to personal property. I don't believe in that split second. A, he could have formulated all of that in his head. He could have been startled. Could have been a reflex action. But I don't believe that's a response to eminent danger. I don't think all of that went through his head in a split second. It's his testimony, which is why there's no disputed material fact. The basis for the summary judgment was based on his testimony. He agreed with all of the testimony that we brought forth that indicated that the objective belief was not reasonable and that this was not an unforeseen circumstance based upon the existence of the safety line and that he couldn't have been at risk because of the existence of the safety line. I believe the testimony was the existence of the safety line made the unforeseen circumstance and that eminent risk impossible is what I think Captain Wenzel said. Thank you very much. Thank you. Thank you. Just very briefly, I know we've had a lot of questions, so I'm just going to very quickly go over a few things. I know that counsel mentioned that this was supposed to be a slow exercise, and I certainly appreciate that from a third story window. However, we have to remind ourselves that my client was wearing his full gear, which means about 75 pounds of gear. On top of that, he's a fully grown man, about 200 pounds, I think he said. So all of that has to be factored in when you're at a third story window coming out and you've got gravity working against your weight. So although it may have been designed to go very slowly, it just simply is not the reality of the situation because when you're walking out of a third story window with that kind of weight on you, you're going to rapidly start moving. The other thing I wanted to talk about just very quickly is, counsel mentioned that the safety device was never engaged because he wasn't going fast enough. There's nothing in the record that states that that is why the safety device didn't engage. My client believes it should have engaged. Based on his experience, based on everything he has learned, everything he's known from doing all of the high angles, in his opinion, it should have engaged and it didn't. Why it didn't engage, we don't know. And I know there's been a lot of talk about Firefighter Gonzalez. You have to keep in mind that when we were doing the depositions, my client just lost his friend, Gonzalez. They were very good friends. They did a lot of things outside of work together. And he had just passed away. My client is not going to throw him under the bus. That's just not what he's going to do. Of course, in his mind, in his view, everything was done the way it should have. We simply don't know because the safety device was taken down. It should not have been. And Battaglia Chief. Would you maybe have a claim for spoilation of evidence? But we have to take the testimony of your client at face value. Right. We do have testimony in regard for Battaglia Chief Wenzel, who did say that it was inappropriate for Firefighter Gonzalez to take that safety down. It should have been kept up. So I think we do have to take it at face value, but we also have to remind ourselves that we're dealing with human beings and they have human emotions and take that into account when we're looking at his testimony. You argue in your brief that the client's reaction was, quote, reasonable based upon his subjective past experience as a lieutenant experiencing using escape apparatus, including high angle escape devices. And then in your brief, you refer to Heron v. Addison Police Pension Board and Merrill v. Orland Park Police Pension Board using this argument about subjective belief. Does the phrase subjective belief appear in either one of those cases? Well, I think if you read them, the court may not use subjective, the word subjective view, but they most certainly talked about, I believe actually Merrill did, they talked about what he, talking about the actual police officer, what he believed happened. And that's the first issue. Did he believe it was an emergency? And then the next is whether or not that belief was objectively reasonable, correct? I believe you do have to mix the two, yes. And I believe that looking at Italian Chief Wenzel's testimony in his deposition, him saying that it's just simply impossible that my client would have been in any type of danger, I think you have to take that with a little grain of salt because he's in a third floor window. There's always a possibility of something going wrong. And any firefighter with the training my client has had, any firefighter going through a training exercise, believing that these are the steps that are going to happen in the training exercise, and having something go completely opposite of what you're expecting is going to reasonably react to that. And that's what my client did. He reacted to something that wasn't supposed to happen. We have to keep in mind... He testified that the injury occurred while he was righting himself, correct? I think he... He was changing positions from head first, face down, to flipping himself, correct? I believe what he said is during the time he was, and it was such a split second, he couldn't really pinpoint exactly when the safety device... Whatever happened, somehow the maneuver and the slippage occurring probably simultaneously is what contributed or caused the injury because when he's... His testimony was when he was righting himself, or when he was flipping, correct? I believe so. I did want to just point out very quickly, if I may. Go ahead. I know there was a discussion from counsel about my client pushing to do this that particular day. Let's remind ourselves here that in the record it's very clear that he specifically asked permission from Battalion Chief Wenzel, who said, yes, absolutely, you can do it. Battalion Chief Wenzel also knew that it is pursuant to Lake Zurich rules that a safety structure should have been there. They simply didn't have that. They allowed Firefighter Wenzel to do it, who's experienced as well, absolutely, but they didn't follow the protocol and they should have had somebody there. If my client was using the safety device inappropriately, I shouldn't say inappropriately, incorrectly, because he misunderstood the video, which was a very short video, there might have been somebody there to tell him, hey, hold on a second, you're supposed to do this and that, and there just simply wasn't. So he was relying on his experience and he's relying on what he saw in that video. And in his view, it just, that's not what was supposed to happen and he had to react to it. Thank you. Anything else? Thank you very much, counsel. The court will take this matter under advisement and render a decision in due course. We stand in recess until the next case. Thank you.